ELIZABETH MCNULTY (SBN 192455)
Email: emcnulty@efsmmlaw.com
JOSHUA D. COOLS (SBN 319531)
Email: jcools@efsmmlaw.com
R. DALLIN SOPP (SBN 324571)
Email: dsopp@efsmmlaw.com
EVANS FEARS SCHUTTERT MCNULTY MICKUS
1 Park Plaza, Suite 500
Irvine, CA 92614
Telephone: (949) 301-9464
Facsimile: (949) 966-0706
E-Service: efsmmfordconsumer@efsmmlaw.com

Attorneys for Plaintiff
MONOPRICE, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONOPRICE INC.,<br><br>Plaintiff,<br><br>v.<br><br>ADTEK LIMITED GROUP,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**1) BREACH OF CONTRACT**<br>**2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |

Plaintiff, MONOPRICE INC. (hereinafter referred to as "Plaintiff and/or MONOPRICE"), hereby submits this Complaint for Damages against Defendant ADTEK GROUP LIMITED (hereinafter referred to as "Defendant and/or Adtek") and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds the sum of $75,000 and Plaintiff and Defendant are companies that do not reside or have domiciles in the same State.

2. Venue is proper in this district because a substantial part of the events giving rise to the claims occurred within the Central District of California.

## PARTIES

3. Plaintiff, Monoprice Inc. ("Monoprice") is an online retail company with a principal place of business in Rancho Cucamonga, California.

4. Defendant, Adtek Group Limited ("Adtek"), is a company that supplies fiberoptic cables and is headquartered in Shenzhen, China. Adtek regularly supplies fiberoptic cables to companies, including Monoprice, in the United States and obtains the economic and other benefits of doing business in the United States on a regular basis.

## FACTUAL ALLEGATIONS

5. On March 14, 2013, the Plaintiff and Defendant entered into a Master Supply Agreement dated March 14, 2013 ("the Agreement") attached as Exhibit "1" to the Complaint.

6. Under the Agreement, Defendant was required to supply Plaintiff with Communications Multipurpose Cable, Riser ("CMR cables") subject to certain certifications, guarantees and warranties. Defendant supplied CMR cables to Plaintiff but failed to provide the CMR cables in conformance with its obligations under the Agreement and in breach of the Agreement and its obligations thereunder, as further detailed below.

7. On February 28, 2020, Underwriters Limited ("UL"), a global safety independent science company, released a notification indicating some of the CMR Cable supplied by Plaintiff to Defendant did not meet certain flammability requirements under UL 1666. ("UL Warns of Potentially Hazardous Communications Cable (Release 19PN-27)" ("UL Notice").

8. Upon receipt of the UL notice, Plaintiff contacted Defendant and was informed by Defendant that the purported issue was limited to a small production of 12-15 boxes where a "worker used the wrong materials at the night production

shift" on the CMR Cable jacket material. In response, Plaintiff requested detailed information from Defendant to support the representations regarding the cables. Plaintiff did not respond. Hearing no immediate response, Defendant engaged a third-party expert to evaluate and test the CMR cables. Despite repeated requests for additional information, Defendant failed to provide documentation to support its claims that the UL identified failure was in fact limited to a small production of 12-15 boxes where a "worker used the wrong materials at the night production shift" on the CMR Cable jacket material.

9. Initial flammability testing by Defendant's third-party expert indicated that the CMR cables appeared to be compliant and suggested that the testing by UL may have been wrong. Unfortunately, subsequent testing performed by Intertek concluded that the CMR cables did not pass full UL 1666 testing.

10. Even more disturbingly, Defendant learned for the first time through the Intertek testing, that the non-compliance with UL 1666 flammability testing was much broader than the 12-15 boxes claimed by Plaintiff.

11. Despite additional requests, Defendant refused to provide information in response to Plaintiff's requests.

12. Because the CMR cables provided by Defendant failed the UL 1666 flammability safety standards which could cause an increased risk of fire and injury and the testing confirmed that the CMR cable constituted a probable safety hazard, Defendant had a mandatory reporting obligation to the Consumer Product Safety Commission ("CPSC") and initiated, in conjunction with the CPSC, a product recall. Consumers were advised to immediately stop using the recalled CMR cables and to contact Monoprice to schedule a free installation visit to inspect and replace the CMR cables, at no charge.

13. As a result of the defective and non-complaint CMR cable provided by Defendant to Plaintiff that did not conform with the Agreement obligations of Defendant and which presented an increased risk of fire and injury to consumers

due to its non-compliance with flammability standards and testing, Plaintiff was forced to recall the product and incur excessive monetary damages and damage to its reputation.

14. Under the Agreement, Defendant was required to manufacture and supply the CMR cables itself, but failed to do so and fraudulently hid this fact from Plaintiff. The Agreement specifically provided that Defendant would not subcontract the manufacturing without the express prior written consent of Plaintiff. Defendant breached the agreement by outsourcing manufacture to Taifeng Electrical Co. Ltd. ("Taifeng"), a fact that was unknown to Plaintiff until well after it initiated its investigation regarding the defective CMR cable and well after the testing by UL and verification by Intertek of the defective nature of the CMR cable.

15. Further, the Agreement provided that all products provided by Defendant to Plaintiff, "[s]hall be subject to inspection and testing by Monoprice, its agents or employees and any governmental agencies to the extent practicable at any and all times and places including the period of manufacture and prior to final acceptance by Monoprice and its customer. Such testing shall include any and all testing specified in the Guidelines and such additional testing as may be deemed necessary by Monoprice from time to time. Such testing shall be at Supplier's cost to the extent set forth in the Guidelines. Notwithstanding the foregoing, Monoprice's right of inspection shall be continuing in nature, and neither retention nor resale of such Products shall be construed as constituting an acceptance of Products not in compliance with the requirements of a Purchase Order or this Agreement nor waive any of Monoprice's rights relating thereto." Defendant breached this agreement because the products provided by Defendant were not appropriately tested and did not pass UL testing and, Defendant did not reimburse Plaintiff for testing.

16. The Agreement further provided that:

> "As used herein, an "Epidemic Failure" shall mean (A) the occurrence of a defect in a Product category discovered either in testing, through inspection or in the field of (i) at a failure rate over any rolling sixty (60) day period exceeding two percent (2%) of such Product delivered by Supplier to Monoprice during such period; or (ii) at a failure rate for Products subject to a particular Purchase Order exceeding two percent (2%); or (B)if there is a Product recall. Notwithstanding anything to the contrary contained herein, Monoprice shall have the right to return all such Products involved in an Epidemic Failure in accordance with 6.5 below, and Monoprice shall take credit for Monoprice's total Monoprice cost of such Products and Monoprice's return shipping costs against any Supplier outstanding invoice. If Supplier does not have an open Invoice with Monoprice, Supplier shall issue a refund or credit to Monoprice for the full amount paid by Monoprice for such Products and Monoprice's return shipping costs. Additionally, if an Epidemic Failure occurs, Supplier will propose an action plan within five (5) business days to fix the failure of any affected Products and to implement immediately such action plan upon Monoprice's acceptance thereof. Any repair or replacement agreed upon by Monoprice to remedy the Epidemic Failure shall be done at mutually agreed-upon locations; provided, however that costs of repair or replacement together with the shipping, transportation and other costs of gathering and redistributing the affected Products shall be borne solely by Supplier. Additionally, Supplier shall reimburse Monoprice for any other direct costs incurred by Monoprice as a result of the Epidemic Failure; provided that in no event shall the foregoing limit Supplier's indemnification obligations hereunder for third (3rd) party claims."

17. The defective CMR Cables constituted an epidemic failure under the Agreement and yet, Defendant repeatedly failed and/or refused to refund or credit Plaintiff for the defective CMR Cable despite numerous demands including but not limited to those sent on October 12, 2021, October 25, 2021, March 9, 2022, April 5, 2022. Adtek also breached this provision by failing to provide an action plan within five (5) business days of learning of the "epidemic failure" and by failing to reimburse any direct costs incurred by Defendant resulting from the epidemic failure and product recall.

18. Under the Agreement, the parties agreed that Plaintiff is entitled to

return "defective products," and seek recovery of any packaging/transportation/storing costs of at least 10% of the price for such "defective products" together with any landing/reshipping costs. Defendant breached this provision of the Agreement by not reimbursing Plaintiff for return of the defective CMR Cable or costs for packaging and transportation.

19. In addition, under the Agreement Defendant agreed to the following warranty provision with respect to the CMR Cables:

> 12.1 Warranty. Supplier warrants that for 28 months from the date of shipment by Supplier as evidenced by the bill of lading (the "Warranty Period") (a) the Products will be of merchantable quality free from all defects in design, workmanship and materials, will be fit and safe for the particular purpose for which they are intended to be used (including consumer use); (b) the Products will be in strict accordance with the specifications, samples, drawings, designs and other requirements including performance specifications approved or adopted by Monoprice for the applicable Product; (c) the Products will be of comparable quality to all samples delivered to Monoprice; (d) the products will not be adulterated, misbranded, falsely labeled or advertised, or falsely invoiced within the meaning of any local, state or federal laws no in force, (e) the Products will comply with all applicable governmental laws and regulations, (f) reasonable and representative tests made in accordance with the requirements of the U.S. Flammable Fabrics Act, if applicable, show that the Products are not so flammable as to be dangerous when used by individuals, (g) the Products are properly labeled as to the content as required by applicable U.S. Federal Trade Commission Trade Practice Rules, the U.S. Fair Labor Standards Act, the U.S. Consumer Product Safety Commission and similar laws, rules and regulations, (h) the Products ordered herein shall be delivered in good and undamaged condition, (i) the Products do not infringe upon or violate any patent, copyright, trademark, trade name, trade dress or any other intellectual or proprietary property right of any third party (and this warranty is not limited to the term of the Warranty Period), (j) all weights, measures, sizes, legends and descriptions printed, stamped, attached or otherwise indicated with regard to the Products are true and correct, and conform and comply with all applicable laws, rules, regulations, ordinance, codes and standards of federal, state and local governments, (k) neither the Products nor the importation is in violation of any other laws, ordinances, statutes, rules or regulations of the country of destination or any state or local

> government or any subdivision or agency thereof, (l) all of the Products will be free of any claim of any nature by any third person and Supplier will convey clear title thereto to Monoprice as provided hereunder, and (m) all sales made hereunder are or will be made at not less than fair market value under the United States Antidumping Law (19 U.S.C. Sec. 167 et seq.). Supplier will indemnify, defend and hold Monoprice harmless from and against any costs or expenses (including but not limited to any antidumping duties which may be imposed) arising out of or in connection with any breach of this warranty. Any attempt by Supplier to limit, disclaim or restrict any such warranties or remedies of Monoprice by acknowledgement or otherwise in accepting or performing a Purchase Order shall be void. All product warranty claims from customers relating to the manufacture or production of the Products shall be the sole responsibility of Supplier. It shall be within the sole discretion of Monoprice to determine when the above-mentioned warranties and guarantees have been breached. In addition to the other guarantees and warranties contained in this paragraph, the implied warranties of the California Uniform Commercial Code are specifically incorporated herein. Nothing contained in this Purchase Order shall be deemed a waiver of implied warranties.

20. Defendant breached the Section 21.1 warranty provision of Agreement by failing to provide CMR cable that met product specifications, providing defective and dangerous CMR cable and failing to provide CMR cable that passed UL 1666 testing. Defendant also failed to comply with its warranty obligations because it has failed and refused to indemnify, defend, and/or hold Plaintiff harmless from and against any costs or expenses arising out of the breach of this warranty and instead consciously and with total disregard for Plaintiff's economic viability, did cause and continues to cause Plaintiff economic harm. Defendant has further failed to comply with defense and indemnification obligations set forth in Section 12.2 of the Agreement.

21. Defendant further agreed to the following provision in signing onto the Agreement:

> 12.6 <u>Insurance</u>. Supplier, at its sole cost and expense, shall obtain and maintain in full force and effect, during

> the term of this Agreement, a policy of insurance insuring against those risks customarily insured under comprehensive general liability policies, including without limitation, "product liability" and "completed operations." Such policies of insurance shall have endorsements or coverage with combined single limits of not less than $2,000,000 and shall name Monoprice as an additional insured thereunder. On or prior to the termination or expiration of this Agreement, Supplier shall obtain and keep in force a rider, endorsement or other appropriate policy that cannot be cancelled and that extends the cover of the comprehensive general liability policies referred to in the immediately preceding sentence for the benefit of Supplier to all claims made within twenty-four (24) months after its termination or expiration in relation to any act or omission of Supplier, under this Agreement before its termination or expiration. Supplier also, at its sole cost and expense, shall obtain and maintain in full force and effect during the term of this Agreement, a policy of insurance insuring all of the equipment of Monoprice in Supplier's possession as bailee for the full replacement cost. All insurance policies shall provide that they cannot be cancelled without 30 days' prior written notice to Monoprice, the "other insurance" clause, if any, will be deleted from such policies, the insurance under such policies shall be primary and any other insurance in force shall be neither primary nor contributing. Supplier must provide Monoprice with a certificate of insurance or other evidence that the appropriate insurance set forth herein is in effect.

22. Defendant breached the Agreement by failing to acquire insurance that complied with the terms of the Agreement and failed to respond and provide proof of said insurance because it failed to properly acquire said insurance.

## <u>FIRST CAUSE OF ACTION</u>

## BREACH OF CONTRACT

23. Plaintiff realleges Paragraphs 1 through 22 and incorporates them by reference as is fully set forth herein.

24. Plaintiff and Defendant entered the Agreement on March 13, 2013 with each of the parties entering the Agreement freely and without reservation.

25. Plaintiff fulfilled all of its obligations under the Agreement and is not

in breach of any contract, provision or obligation with Defendant.

26. Defendant materially and intentionally breached the Agreement and its obligations thereunder for the reasons set forth in Paragraphs 5 through 22, including but not limited to:

a. subcontracting out the manufacture of the CMR cables to Taifeng without securing prior written consent from Monoprice in contravention of Section 3 of the Agreement;

b. providing CMR cable that did not pass UL 1666 testing and did not comply with required specifications in contravention of Section 6.1 of the Agreement;

c. failing to reimburse Monoprice for any costs associated with the "defective product" and failing to provide Monoprice with records relating to its inspection work in contravention of Section 6.2 of the Agreement;

d. failing to refund or credit Monoprice for the defective CMR cable, failing to provide an action plan of learning of the "epidemic failure" and failing to reimburse any direct costs incurred by Monoprice as a result of the product recall in contravention of Section 6.3 of the Agreement;

e. failing to comply with customer return provisions in contravention of Sections 6.4 and 6.5 of the Agreement;

f. failing to comply with warranty provisions in contravention of Section 12.1 of the Agreement;

g. failing to defend and indemnify Monoprice for any loss or damages arising out of the product recall in contravention of Section 12.2 of the Agreement; an

h. failing to secure necessary insurance in contravention of Section 12.6 of the Agreement.

27. As a direct result of Defendant's breach of the agreement, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial, but which currently exceeds $2,058,924.17, accruing additional interest per annum on a daily basis until paid in full.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

28. Plaintiff realleges paragraphs 1 through 26 above and incorporate them by reference as if fully set forth herein.

29. Implied in all contracts governed by California law is a promise of good faith and fair dealing, which obligates the parties to act in good faith. The implied promise means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

30. By its conduct set forth above and incorporated herein, Defendant has breached the covenant of good faith and fair dealing and has wrongfully deprived, impaired, and injured Plaintiff's enjoyment of the rights, benefits and full value and fruits of the Agreement despite Plaintiff's performance of all of its contractual obligations owed to Defendant.

31. As a direct and proximate result of Defendant's breach of the Agreement, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial, but which currently exceeds $2,058,924.17, accruing additional interest per annum on a daily basis until paid in full.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court make findings and enter judgment as follows:

a. That Defendant has materially breached its Agreement with

Plaintiff by outsourcing supply of the CMR Cables without notifying Defendant;

b. That Defendant has materially breached its Agreement with Plaintiff by failing to secure the insurance required under the Agreement;

c. That Defendant has materially breached its Agreement with Plaintiff by failing to reimburse any direct costs incurred by Plaintiff resulting from the product recall of the defective CMR cables supplied by Defendant;

d. That Defendant has materially breached its Agreement with Plaintiff by failing to reimburse Plaintiff for defective CMR supplied under the Agreement;

e. Defendant has materially breached its Agreement with Plaintiff by failing to comply with its warranty obligations under the terms of the Agreement;

f. That Plaintiff is entitled to an award of damages arising out of Defendant's material breach of the Agreement in an amount satisfying the full amount of the lost sales resulting from product shortage caused by and arising out of the recall and all damages accruing from removal, replacement, and recall of the CMR cables, plus interest on unpaid amounts accrued at the monthly rate as set forth in the Agreement through the date of final judgment;

g. For reasonable attorney fees incurred by Plaintiff in the pursuit of Defendant's rights under the Agreement and in pursuit of this Action;

h. For all costs incurred by Plaintiff in the pursuit of its rights under the Agreement and in pursuit of this Action against Defendant;

i. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury on all issues so triable

Dated: January 16, 2024

EVANS FEARS SCHUTTERT MCNULTY MICKUS

/s/ Elizabeth V. McNulty
Elizabeth V. McNulty
Joshua D. Cools
R. Dallin Sopp
Attorneys for Defendant
MONOPRICE, INC